IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

**DEBBIE BASS,**

　　　　　　Plaintiff,

v.

**ARCHBOLD MEDICAL CENTER
d/b/a BROOKS COUNTY
HOSPITAL,**

　　　　　　Defendant.

Civil Action No. 7:14-CV-201

**ORDER**

　　　　Plaintiff Debbie Bass, an African-American female, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"). Plaintiff asserts that Defendant Archbold Medical Center discriminated against her on the basis of her race and retaliated against her for reporting allegedly unlawful employment practices. Now before the Court is Defendant's Motion for Summary Judgment (Doc. 12). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and determining that there is no genuine dispute of the material facts, the Court finds that Defendant is entitled to judgment as a matter of law and grants Defendant's motion.[1]

---

[1] The complaint presently before the Court is one in a series of meritless and potentially frivolous complaints filed by counsel for Plaintiff, James Garrity.

## I.      LOCAL RULE 56

Plaintiff's Statement of Disputed and Undisputed Facts (Doc. 25) complies in no part with the local rule, which provides, "The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried.  Response shall be made to each of the movant's numbered material facts."  M.D. Ga. L.R. 56.  Rather than responding to each numbered paragraph as directed by the rule, Plaintiff essentially has responded in the form of a supplemental brief, which is insufficient under the local rule.   The Court accordingly deems admitted Defendant's statement of facts that are properly supported by citations to the record.  M.D. Ga. L.R. 56; see also Mann v. Taser Intern., Inc., 588 F.3d 1291, 1303 (11th Cir. 2009) (holding that district court properly deemed defendant's statement of material facts admitted when plaintiff failed to comply with the local rule); BMU, Inc. v. Cumulus Media, Inc., 366 Fed. App'x 47, 49 (11th Cir. 2010) (affirming grant of summary judgment when respondent failed to file a response to movant's statement of undisputed facts).

---

Although not sought by Defendant, the Court gave some thought as to whether a *sua sponte* Rule 11 sanction was appropriate in this case.  While the Court declines to levy sanctions at this time, Mr. Garrity should be warned that the future pursuit of frivolous litigation in this Court will result in the imposition of sanctions.

## II.   FACTUAL BACKGROUND

Defendant Archbold Medical Center, Inc., operates Brooks County Hospital in Quitman, Georgia.  (Doc. 12-2, ¶ 2).  Defendant hired Plaintiff Debbie Bass on December 28, 2004 to the position of Registration Officer.  (Doc. 12-2, ¶ 3).  In June of 2006, Plaintiff completed a radiology technology program at Valdosta Tech.  (Doc. 12-2, ¶ 6).  By virtue of her degree, Plaintiff applied for and received a promotion to the position of PRN ("part time" or "as needed") radiology technologist on February 1, 2007.  (Doc. 12-2, ¶¶ 7, 8).  At that time, Zinda McDaniel, Radiology Coordinator, began supervising Plaintiff.  (Doc. 12-2, ¶ 10). Ms. McDaniel retired in 2008, and Kristi Hylton was promoted to the position of Radiology Coordinator.  (Doc. 12-2, ¶ 11).  Ms. Hylton assumed supervision duties over Plaintiff.  (Doc. 12-2, ¶ 12).

When Ms. Hylton was promoted to Radiology Coordinator, a full-time radiology technologist position for the second shift became available.  (Doc. 12-2, ¶¶ 13–14).  Ms. Hylton interviewed candidates and hired Plaintiff for the position on August 11, 2008.  (Doc. 12-2, ¶¶ 15–16).  Plaintiff believes that Ms. Hylton attempted to hire a Caucasian male for the position prior to awarding the job to Plaintiff.  (Doc. 12-2, ¶¶ 19–20).  Plaintiff does not know the identity of the Caucausian male to whom Ms. Hylton allegedly offered the position, and other than Plaintiff's allegation, there is no evidence that any other individual was offered the job prior to Plaintiff.  (Doc. 12-2, ¶¶ 20, 22–23).  In addition to Plaintiff,

there were five radiology technologists employed by Defendant and supervised by Ms. Hylton, three of whom were African American. (Doc. 12-2, ¶ 24).

Plaintiff primarily worked the second shift. (Doc. 12-2, ¶ 26). When Plaintiff was hired for the position, the shift was 3:00 pm to 11:00 pm. (Doc. 12-2, ¶ 26). The shift was later changed to 4:00 pm to 11:00 pm. (Doc. 12-2, ¶ 26). In 2008, as a result of budgetary concerns, the hospital began pushing reductions for hourly employees. (Doc. 12-2, ¶ 27). As a result, everyone in the radiology department had their hours reduced, and no one was supposed to receive a weekly schedule of 40 hours unless necessary. (Doc. 12-2, ¶ 27). Plaintiff's work schedule was impacted by the reductions, as were the schedules of all of the radiology technologists. (Doc. 12-2, ¶ 28). The reduced-hour schedules typically called for 32 to 38 work hours each week. (Doc. 12-2, ¶ 28). The hospital was still operating under the reduced hours schedule as of the filing of Defendant's motion for summary judgment. (Doc. 12-2, ¶ 4).

During her employment with Brooks County Hospital, Plaintiff was disciplined on several occasions for various policy violations. Plaintiff received two Verbal Corrective Interviews for overtime violations: one on September 5, 2008 and another on October 17, 2008. (Doc. 12-2, ¶ 31). Plaintiff received a Final Corrective Interview from Ken Rhudy, the Administrator at Brooks County Hospital, on November 7, 2013. The Final Corrective Interview occurred because of an argument between Plaintiff and Ms. Hylton on October 25, 2013 and another incident that same day involving Plaintiff and a co-worker. (Doc. 12-

2, ¶ 49).   The argument between Plaintiff and Ms. Hylton concerned Plaintiff's belief that she was never included in Radiology Week events.  (Doc. 12-2, ¶ 51). On the Final Corrective Interview form, Plaintiff alleged that Ms. Hylton "ha[d] been attacking [her] for years."  (Doc. 12-2, ¶ 53).  Mr. Rhudy spoke with both Plaintiff and Ms. Hylton and explained that he wanted them to get along.  (Doc. 12-2, ¶ 52).

The majority of Plaintiff's policy violations involved excessive tardiness. Ms. Hylton's policy was to consider an employee late if he or she clocked in more than one minute after the start of the shift.  (Doc. 12-2, ¶ 46).  Hospital policy requires corrective action if an employee is tardy three or more times in a 90-day period.  (Doc. 12-2, ¶ 40).  Plaintiff received four Tardiness Disciplinary Actions over the course of her employment, on April 24, 2013, October 7, 2013, December 9, 2013, and February 11, 2014.  (Doc. 12-2, ¶ 31).  Each of these Tardiness Disciplinary Actions was issued as a result of Plaintiff being late to work at least three times in a 90-day period.  (Doc. 12-2, ¶ 40).  The October 7, 2013 Tardiness Disciplinary Action was issued because Plaintiff was late on nine separate occasions in September of 2013.  (Doc. 12-2, ¶ 44).  Ms. Hylton has never had an employee have as many tardies as Plaintiff, and has only had to issue one other employee a corrective action for tardiness.  (Doc. 12-2, ¶¶ 47–48).  That employee was Brenda Blair, who is Caucasian.  (Doc. 12-2, ¶¶ 24, 48).

In addition to Plaintiff's disciplinary record, she received two Radiologic Technologist Error and Action Forms: one on December 18, 2008 and another on

5

March 26, 2010. (Doc. 12-2, ¶ 32). The Radiologic Technologist Error and Action Forms are learning tools used to identify and correct technical errors and mistakes and are not intended to be disciplinary tools. (Doc. 12-2, ¶¶ 32, 33). All of the radiology technologists in the department have received an Error and Action Form, including Ms. Hylton. (Doc. 12-2, ¶ 34).

Following the October 25, 2013 altercation with Ms. Hylton, Plaintiff began stopping by the office of Janet Eldridge, Personnel Coordinator, to informally complain about Ms. Hylton. (Doc. 12-2, ¶ 57). Plaintiff did not mention race in her complaints, until she filed a formal grievance on November 25, 2013. (Doc. 12-2, ¶¶ 57, 59). In her grievance, Plaintiff itemized several complaints about Ms. Hylton: Ms. Hylton cutting Plaintiff's hours when she was a PRN employee in 2007 or 2008; Ms. Hylton supposedly offering Plaintiff's position to a Caucasian male in 2008 prior to hiring Plaintiff; Ms. Hylton yelling at Plaintiff when she stated that Plaintiff would receive a write up if she was ever late; Plaintiff receiving a write up when she and her co-worker (Jackie Adams, African American) worked a patient together with incorrect paper work; Plaintiff being left out of department events; Plaintiff not receiving 40 hours per week; Plaintiff being written up for being late; and Plaintiff having to work holidays. (Doc. 12-2, ¶ 60).

On December 5, 2013, Plaintiff met with Ms. Eldridge, Ms. Hylton, and another hospital employee named Glenda Creech. (Doc. 12-2, ¶ 61). During the meeting, Plaintiff reiterated many of the concerns raised in her formal grievance: that Plaintiff was not included in radiology events, that Ms. Hylton originally

6

wanted to hire a Caucasian male for Plaintiff's position, that Plaintiff was written up for being tardy, that Plaintiff was never asked if she would like holidays off, that Plaintiff did not get to work 40 hours a week, and that she believed Ms. Hylton "had it out for her" in general. (Doc. 12-2, ¶ 62). It was explained to Plaintiff that she was the only one who was hired for the full-time position in 2008 and that no one was receiving 40 hour work weeks because of cutbacks. (Doc. 12-2, ¶ 62). Further, Plaintiff was told that the hospital's policy calls for tardy employees to receive write ups, and she should try to get to work on time. (Doc. 12-2, ¶ 62).

Plaintiff filed an addendum to her grievance on January 12, 2014. (Doc. 12-2, ¶ 68). Plaintiff raised the same topics that were discussed in the grievance meeting, but stated that she was including "race discrimination, age, and retaliation." (Doc. 12-2, ¶ 69). Plaintiff had a second grievance meeting with Mr. Rhudy, Ms. Eldridge, and Ms. Creech on January 13, 2014. (Doc. 12-2, ¶ 71). Plaintiff explained that she was upset that Ms. Hylton wrote her up on December 9, 2013 for being tardy. (Doc. 12-2, ¶ 72). Plaintiff was again told that, if she came to work on time, she would be fine. (Doc. 12-2, ¶ 72). Further, Mr. Rhudy disclosed that Plaintiff had received more hours than any other employee in the radiology department, other than Billy Green, who is African American. (Doc. 12-2, ¶ 72). When asked about her race and age complaints, Plaintiff explained that her race complaint was because Ms. Hylton attempted to hire a Caucasian male back in 2008, and her age complaint was based on Ms. Hylton's statement

7

during the October 2013 altercation that Plaintiff was "not acting her age." (Doc. 12-2, ¶ 72).

Following the second grievance meeting, Plaintiff's complaints were investigated. (Doc. 12-2, ¶ 74). Plaintiff had a third and final grievance meeting on January 28, 2014 with Mr. Rhudy and Ms. Eldridge. (Doc. 12-2, ¶ 75). Mr. Rhudy told Plaintiff that all of her grievances had been reviewed. (Doc. 12-2, ¶ 76). He explained that there appeared to be tension between Plaintiff and Ms. Hylton and said that they needed to work together. (Doc. 12-2, ¶ 76). He suggested that, if Plaintiff got to work on time, things would run more smoothly. (Doc. 12-2, ¶ 76). He told Plaintiff that he could not give her more hours to work because of the budget. (Doc. 12-2, ¶ 76). Plaintiff stated that she understood Mr. Rhudy's explanations, and the meeting was concluded. (Doc. 12-2, ¶ 76).

Shortly thereafter, on February 11, 2014, Plaintiff received another Tardiness Disciplinary Action from Ms. Hylton. (Doc. 12-2, ¶ 77). Plaintiff refused to sign that document and stated that she had a lawyer and was going to file suit. (Doc. 12-2, ¶ 78). Plaintiff made no further complaints to Ms. Eldridge or Ms. Hylton. (Doc. 12-2, ¶¶ 78–79). Ms. Eldridge believed that the issues had been resolved. (Doc. 12-2, ¶ 81). Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission in March of 2014. (Doc. 12-2, ¶ 93). The EEOC issued Plaintiff a Notice of Right to Sue dated September 15, 2014. (Doc. 17, p. 50).

8

Plaintiff was out extensively for medical issues beginning in June of 2014. She was out approximately eight months intermittently over the next year.  (Doc. 12-2, ¶ 80).  Plaintiff voluntarily submitted a notice of resignation on May 29, 2015, effective June 10, 2015.  (Doc. 12-2, ¶ 82).  Plaintiff was never demoted, suspended, or terminated.  (Doc. 12-2, ¶ 85).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party.  Id. at 254–55.  The court may not, however, make credibility determinations or weigh the evidence.  Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323 (internal quotation omitted).  If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law.  Id. at 324–26.  This evidence must consist of more than conclusory allegations.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## IV.   DISCUSSION

Plaintiff alleges that Defendant discriminated against her on the basis of race, in violation of Title VII and § 1981, by writing her up for tardiness and allegedly reducing her work hours, by creating a hostile work environment, and by retaliating against her for voicing opposition to Defendant's allegedly unlawful employment practices.  Title VII and § 1981 "have the same requirements of proof and use the same analytical framework."  Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).  Accordingly, the Court will address Plaintiff's Title VII claims with the understanding that the analysis also applies to the § 1981 claims.

A.     **Race Discrimination Claim**

1.     **Disparate Treatment**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can establish a prima facie case of discrimination through either direct or circumstantial evidence.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004).   Claims of race discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green.[2]  In order to make out a prima facie case under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Id. at 254–55.  "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged

---

[2] 411 U.S. 792 (1973)

reason of the employer is a pretext for illegal discrimination." <u>Wilson</u>, 376 F.3d at 1087.

To establish a prima facie case of race discrimination under Title VII, a plaintiff must show: "(1) [s]he belongs to a racial minority; (2) [s]he was subjected to [an] adverse job action; (3) [her] employer treated similarly situated employees outside [her] classification more favorably; and (4) [s]he was qualified to do the job." <u>Holified</u>, 115 F.3d at 1562 (citing <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802). The parties here do not dispute that Plaintiff is an African American or that she was qualified for her job. Plaintiff has not established a prima facie case of disparate treatment because she was not subjected to an adverse job action and because she fails to point to a similarly situated comparator who was treated more favorably.

A.    Adverse Employment Action

To establish an adverse employment action, a plaintiff must show either: (1) an ultimate employment decision, such as termination, failure to hire, or demotion; or (2) for conduct falling short of an ultimate employment decision, conduct that "in some substantial way, alter[s] the employee's compensation, terms, conditions, or privileges of employment, deprive[s] him or her of employment opportunities, or adversely affect[s] his or her status as an employee." <u>Crawford v. Carroll</u>, 529 F.3d 961, 970 (11th Cir. 2008).

Here, there was no ultimate employment decision. Plaintiff voluntarily resigned. (Doc. 12-2, ¶ 83). Plaintiff contends, in her response to Defendant's

motion for summary judgment, that she was constructively discharged and that she "had no choice but to quit" due to intolerable conditions.  (Doc. 24, p. 12). However, Plaintiff failed to plead a constructive discharge claim in her complaint, and has never amended her complaint to include such a claim.   Plaintiff's constructive discharge claim was raised for the first time in her summary judgment briefing.  "A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."  Gilmour v. Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004).  Accordingly, that claim may not be considered by the Court.[3]

---

[3] Although the Court may not consider Plaintiff's argument that she was constructively discharged, the Court notes that such a claim would fail as a matter of law based on the evidence presented.  A constructive discharge occurs "when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in [the employee's] position would have been compelled to resign."  Fitz v. Pugmire Lincoln-Mercury, Inc., 348 F.3d 974, 976 (11th Cir. 2003).  Plaintiff has failed to present evidence that the conditions of her employment were so intolerable that she was *compelled to resign*.  Rather, Plaintiff testified in her deposition that she resigned "[b]ecause [she] got a better opportunity, and with [her] history there already, [she] wanted to leave."  (Doc. 15, p. 114).  When asked what she meant by "history," Plaintiff replied that she was referring to her history with Kristi Hylton.  (Doc. 15, p. 114).  The allegations regarding Plaintiff's "history" with Kristi Hylton, taken together, do not rise to the level of creating a workplace so intolerable that a reasonable person would have been compelled to resign, as is required to establish constructive discharge. Furthermore, Plaintiff's contention that she was told she was going to be replaced upon her return from medical leave (Doc. 1, ¶ 11) is too speculative to support a claim for constructive discharge.  See Fitz, 348 F.3d at 978 (upholding the district court's order granting summary judgment on the plaintiff's argument that he was constructively discharged because his co-workers told him that his employer planned to fire him because of his race at some point in the future, "declin[ing] to reach a holding that would encourage speculative litigation").

Further, Plaintiff has failed to present any evidence that her race negatively impacted her compensation; that the terms, conditions, or privileges of her employment were altered; that she was deprived of employment opportunities; or that her status as an employee was adversely affected.  Plaintiff first argues that she suffered an adverse employment action when Ms. Hylton repeatedly wrote her up for being tardy.  However, Plaintiff was repeatedly tardy (Doc. 12-2, ¶ 47), and Ms. Hylton had a policy of considering employees tardy if they clocked in more than one minute late.  (Doc. 12-2, ¶ 46).  Plaintiff received four Tardiness Disciplinary Actions over the course of eight years of employment.  (Doc. 12-2, ¶ 31).  These write-ups had no impact on Plaintiff's employment, and therefore do not constitute an adverse employment action.  See Davis v. Town of Lake Park, 245 F.3d 1232, 1238 (11th Cir. 2001) (rejecting the contention that placing negative job performance memoranda in an employee's file constitutes an adverse employment action)[4].

Plaintiff next argues that she suffered an adverse employment action because she never received a 40 hour work week.  However, none of the radiology technologists were receiving 40 hour work weeks due to the hospital's budgetary concerns.  (Doc. 12-2, ¶¶ 27–28).  In fact, Plaintiff was often assigned

---

[4] In Davis, the Eleventh Circuit Court of Appeals explained that "[n]either of the memos at issue caused [the employee] any present or foreseeable future economic injury."  245 F.3d at 1240.  Despite the fact that the employee felt that the memoranda were "unwarranted, diminished his prestige and self-esteem, and potentially may interfere with (unspecified and unexplored) future job prospects," the Court of Appeals concluded that "Congress simply did not intend for Title VII to be implicated where so comparatively little is at stake."  Id.

14

more work hours than the other radiology technologists because she was the only employee on the second shift.  (Doc. 12-2, ¶ 29).  Plaintiff's reduced-hours work schedule does not constitute an adverse employment action.  Because Plaintiff has failed to demonstrate that she suffered an adverse employment action, she cannot establish a prima facie case of race discrimination, and Defendant is entitled to summary judgment.

B.   "Similarly Situated" Employees

Even if Plaintiff's circumstances constituted an adverse employment action, she has not proffered any evidence that Ms. Hylton treated other "similarly situated" employees more favorably.   "To show that employees are similarly situated, the plaintiff must show that the 'employees are similarly situated in all relevant respects.'"  Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316 (11th Cir. 2003) (citation omitted).  "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  Wilson, 376 F.3d at 1091.  "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  Holifield, 115 F.3d at 1562; see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed.").

Plaintiff has not pointed to a single employee that was tardy as frequently as she was and was not written up.  In fact, Ms. Hylton testified that no employee

has ever been late to work as often as Plaintiff. (Doc. 12-2, ¶ 47). Ms. Hylton has only had to issue one other employee a corrective action for tardiness, and that was to Brenda Blair, a Caucasian employee. (Doc. 12-2, ¶ 48; Doc. 15, p. 178). As far as Plaintiff's one and only final written warning, which followed the altercation with Ms. Hylton, Ms. Hylton was also given a final written warning and thereby received identical treatment. (Doc. 12-2, ¶¶ 49, 52).

Likewise, Plaintiff has failed to present evidence that another similarly situated employee was treated more favorably with respect to hours received in the schedule. As previously stated, everyone in the radiology department was subject to reduced hours beginning in 2008 due to the hospital's budgetary concerns. (Doc. 12-2, ¶ 27). No one was supposed to receive 40 hours unless it was necessary. (Doc. 12-2, ¶ 27). Plaintiff, as a radiology technologist, was in the group that was affected by this reduction. (Doc. 12-2, ¶ 28). Further, as the only radiology technologist who worked the second shift, Plaintiff often received more hours than her co-workers. (Doc. 12-2, ¶ 72). The only employee who received more hours than Plaintiff was Billy Green, another African American radiology technologist. (Doc. 12-2, ¶ 72). Accordingly, Plaintiff has failed to point to an adequate comparator.

Plaintiff has failed to demonstrate that she suffered an adverse employment action, or to produce any evidence of a similarly situated Caucasian comparator who was treated more favorably by her supervisor. As a result, Plaintiff cannot establish a prima facie case of disparate treatment, as required

16

by the McDonnell Douglas framework. Because Plaintiff has so clearly fallen short of stating a prima facie case, the Court need not determine whether Defendant offered a legitimate, non-discriminatory reason for writing Plaintiff up for tardiness or assigning a reduced-hours work schedule, nor whether Defendant's reasons for writing her up or assigning a reduced-hours work schedule were merely pretext. Defendant's motion for summary judgment is granted with respect to Plaintiff's disparate treatment claim.

### 2. Hostile Work Environment

In addition to Plaintiff's complaints of disparate treatment, she alleges that Defendant's "allowance and ratification" of the disparate treatment "perpetuated and facilitated an abusive and offense work environment." (Doc. 1, ¶ 18). The Court finds no validity in Plaintiff's claim.

Title VII is violated "when the workplace is permeated with racially discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)) (internal punctuation omitted). The same is true under § 1981. See Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010); see also Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Shields v. Fort James Corp., 305 F.3d 1280, 1282, n.2 (11th Cir. 2002). An employer therefore is liable to an employee for a racially hostile work environment where

17

the employee proves that "(1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." Id.

The court will consider "the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." Rojas v. Florida, 282 F.3d 1339, 1344 (11th Cir. 2002). However, "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently impact the conditions of employment to trigger the applicability of Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993).

Plaintiff's allegations of hostility in the workplace do not rise to the level of creating a racially hostile work environment. Plaintiff appears to base her hostile work environment claim on the following allegations: Ms. Hylton would not talk to Plaintiff when Plaintiff walked into a room; Plaintiff was left out of "Radiology Week" events; Ms. Hylton would yell at Plaintiff; and Plaintiff was written up for

being only a minute late.  (Doc. 15, pp. 183–84, 200–01; Doc. 12-2, ¶¶ 53–56).

Plaintiff concedes that no one employed by Defendant ever used racially

offensive terms toward her and that there were not racial overtones to any

comments made by Ms. Hylton to Plaintiff.  (Doc. 15, pp. 183, 201).

"Discourtesy or rudeness should not be confused with racial harassment."

Brown v. Greene Cnty., No. 3:05-CV-89, 2007 WL 945144, at *8 (M.D. Ga. Mar.

27, 2007).  While Ms. Hylton's treatment of Plaintiff may be considered rude,

discourteous, and boorish, the Court finds that this does not rise to the level of

creating a hostile work environment.  The conduct Plaintiff alleges was not so

"severe and pervasive" as to alter Plaintiff's work environment, and there is

certainly no indication that Plaintiff was subject to this conduct based on her race.

Plaintiff, therefore, has failed to establish a prima facie case of a racially hostile

work environment and Defendant's motion for summary judgment is granted as

to Plaintiff's hostile work environment claim.

### B.    Retaliation Claim

Finally, the Court grants Defendant's motion for summary judgment with

regard to Plaintiff's retaliation claim.  Plaintiff's retaliation claim is premised on

the allegation that she voiced opposition to unlawful employment practices during

her employment with Defendant and was the victim of retaliation thereafter.

(Doc. 1, ¶¶ 25, 27).  Under Title VII's opposition clause, "an employer may not

retaliate against an employee because the employee 'has opposed any practice

made an unlawful employment practice by this subchapter.'"  E.E.O.C. v. Total

System Services, Inc., 221 F.3d 1171, 1174 (11th Cir. 2000) (citing 42 U.S.C. § 2000e–3(a)).  There is no direct evidence of retaliation on the facts alleged, so this claim must also be analyzed using the McDonnell Douglas framework.  See Adams v. Cobb Cnty. Sch. Dist., 242 F. App'x 616, 620 (11th Cir. 2007).  To state a prima facie case for a Title VII retaliation claim, a plaintiff must show that (1) she engaged in an activity protected by Title VII; (2) she suffered a materially adverse employment action[5]; and (3) the two events were causally connected. Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012).

For claims based on the opposition clause, a plaintiff must also establish "that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  This requirement contains both a subjective and objective component: "[a] plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  Id. (emphasis in original).  "Put differently, an employee's statements constitute 'protected activity' only if they reflect an objectively reasonable, subjective belief that the employer engaged in an

---

[5] The standard for what constitutes an adverse employment action is broader in the Title VII retaliation context than it is for a Title VII race discrimination claim. "For an action to be 'adverse' in the retaliation context, it 'must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Clark v. S. Broward Hosp. Dist., 601 Fed. Appx. 886, 891–92 (11th Cir. 2015) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).

unlawful employment practice." <u>Duncan v. Madison Cnty.</u>, No. 3:05-cv-93, 2007 WL 2874803, at \*7 (M.D. Ga. Sept. 27, 2007).

Plaintiff fails to state a prima facie case of retaliation because she has not established that she had an objectively reasonable belief that Defendant was engaged in unlawful employment practices.   "The reasonableness of the employee's belief is measured against existing substantive law . . . .   No actual unlawfulness is required but the opposed conduct 'must be close enough [to unlawful] to support an objectively reasonable belief that it is.'"   <u>Van Portfliet v. H&R Block Mortg. Corp.</u>, 290 F. App'x 301, 303 (11th Cir. 2008) (quoting <u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1351 (11th Cir. 1999)).

Plaintiff's retaliation claim rests on her contention that she was retaliated against for filing grievances complaining that she was not receiving a 40-hour work week, she was written up for being late, she was left out of Radiology Week events, she was always assigned to work on holidays, and a Caucasian male was initially hired for her position.   As the Court has previously concluded, none of these complaints supports a claim of racial discrimination, and they cannot support an objectively reasonable belief that actionable racial discrimination occurred.

Even if Plaintiff could establish that she had an objectively reasonable belief that Defendant was engaging in unlawful employment practices, Plaintiff's prima facie retaliation claim fails for lack of causation.   To satisfy the causation element, a plaintiff must prove that her complaints were the "but-for" cause of the

adverse action, not just a motivating factor.  Reynolds v. Winn-Dixie Raleigh, Inc., 85 F.Supp.3d 1365, 1373 (M.D. Ga. 2015).  The Eleventh Circuit has "emphasize[d] that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint."  Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1270 (11th Cir. 2010).  Even assuming that Plaintiff could show that being written up for tardiness or not receiving a 40-hour work week were adverse actions sufficient to meet the standard for what constitutes an adverse action in the Title VII retaliation context[6], Plaintiff cannot show that her grievances and complaints were the "but-for" cause of these actions.  Rather, the Tardiness Disciplinary Actions that Plaintiff received were the consequence of her repeated tardiness, and she did not receive a 40-hour work week because the entire radiology department was operating under reduced hours due to budget concerns.  Plaintiff cannot satisfy the causation element of her Title VII retaliation claim, and her prima facie case fails.  Defendant's motion for summary judgment is granted with respect to Plaintiff's retaliation claim.

---

[6] Plaintiff's other complaints—that she was excluded from Radiology Week events and that Ms. Hylton attempted to hire a Caucasian male for her position— clearly fall outside the standard for what constitutes an adverse employment action in the Title VII retaliation context.  No reasonable employee would be dissuaded from making or supporting a charge of discrimination based on these actions.

## V.      CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 12) is granted, and this case is dismissed with prejudice.


**SO ORDERED**, this the 30th day of September, 2016.

*/s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

les